FILED
3rd JUDICIAL DISTRICT COURT
Dona Ana County
5/2/2024 1:01 PM
BERNICE A. RAMOS
CLERK OF THE COURT
Melissa Wood

STATE OF NEW MEXICO
COUNTY OF DOÑA ANA
IN THE THIRD JUDICIAL DISTRICT

MARTYN URQUIJO,                          No.    D-307-CV-2024-01035
                                                 Martin, James T.

              Plaintiff,

v.

PHC-LAS CRUCES, INC. D/B/A/ MMC
FAMILY PRACTICE.

              Defendants.

---

## COMPLAINT FOR BREACH OF CONTRACT AND VIOLATIONS OF TITLE VII, THE NEW MEXICO HUMAN RIGHTS ACT, AND THE FAMILY MEDICAL LEAVE ACT.

Plaintiff Martyn Urquijo ("Dr. Urquijo" or "Plaintiff"), by and through his attorneys at Lubin & Enoch P.C., brings this action against Defendant PHC-Las Cruces, Inc. ("PHC").

## PARTIES AND JURISDICTION

1.      On March 29, 2021, John Harris, the Chief Executive Officer of Memorial Medical Center ("the Hospital"), extended an offer to Dr. Martyn Urquijo to join the Southern New Mexico Family Medicine Residency Program ("the Residency Program").

2.      The Hospital and its Residency Program is located in Las Cruces, New Mexico.

EXHIBIT
A

3.      On June 29, 2021, Dr. Urquijo signed a contract (the "Contract") with PHC-Las Cruces, Inc., d/b/a Memorial Medical Center.  A copy of that Contract is attached hereto as **Exhibit 1**.

4.      On July 1, 2021, Dr. Urquijo began work as a resident physician in the Residency Program, providing resident physician medical services and participating in the educational program.

5.      The Contract provided that the Third Judicial District in Las Cruces, New Mexico shall have exclusive jurisdiction over any and all disputes arising out of this Agreement. **Exhibit 1 at § 5.9.**

6.      PHC-Las Cruces, Inc. ("PHC") is a domestic profit corporation registered in New Mexico.

7.      Upon information and belief, PHC is managed by LifePoint Hospitals, Inc. ("LifePoint"), and the Contract provided that any notices required or permitted therein copy LifePoint.  **Exhibit 1 at § 5.10**.

8.      At all relevant times, PHC executed its general business in New Mexico.

9.      This Court has jurisdiction over the subject matter of this Complaint. N.M. Const. art. VI, § 13.

10.     Venue is proper in this Court pursuant to N.M Stat. Ann. §§ 38-3-1(A).

11.     Jurisdiction and venue are proper in this Court because the claims arise in this district, Defendant's wrongful acts occurred and are occurring in this district, and at all relevant times, Plaintiff performed pursuant to the Contract in this district.

12.     The FMLA provides that an action for damages may be maintained in any state court of competent jurisdiction.  29 U.S.C. § 2617(a)(2).

## FACTUAL ALLEGATIONS

13.     Between July 1, 2021 and June 27, 2023, Dr. Urquijo was a resident physician at Memorial Medical Center in Las Cruces, NM.

14.     As a resident physician, he was both PHC's employee and a participant in its Residency Program, which serves an educational mission of providing didactic and clinical education for doctors in training.

15.     Dr. Urquijo's employment and residency was governed by the Contract. **Exhibit 1.**

16.     Dr. Urquijo was provided with a Resident's Manual (the "Manual"), which also governed his employment. A copy of relevant excerpts from the Manual is attached hereto as **Exhibit 2**.

17.     The Manual states that it consists of policies, duties and responsibilities arising from the following sources: state law, the Accreditation Council for Graduate Medical Education's ("ACGME") requirements, PHC's own policies, as well as obligations arising from the patient-physician relationship.  **Exhibit 2 at 6.**

18.     Because the Manual governed the terms of his residency and employment, Dr. Urquijo relied on its provisions and expected PHC to conform to its procedures.

19.     Dr. Urquijo also relied on ACGME's residency program requirements to govern the terms of his residency and employment because the Residency Program's accreditation is based on its compliance with a basic set of standards called "ACGME Program Requirements for Graduate Medical Education in Family Medicine." A copy of relevant excerpts from the ACGME Program Requirements for Graduate Medical Education in Family Medicine is attached hereto as **Exhibit 3**.

20.     Dr. Urquijo expected PHC to conform to ACGME program requirements.

21.     Dr. Urquijo was disliked by his advisor, Dr. Joanna Rachelson, because of his national origin and his related accent.

22.     Dr. Urquijo knows this because his advisor told him she didn't like his accent and was unable to understand him.  She then inquired into his national origin.

23.     Since that interaction, Dr. Rachelson targeted Dr. Urquijo with unwarranted or disproportionate disciplinary action, including a written warning related to her not hearing or understanding him correctly.

24.     She also failed to support his education by refusing to make eye contact during advisor-resident meetings, failing to engage with his requests for support, and excluding him from rounds with her.

25.     Dr. Urquijo observed that she treated him differently from other residents.

4

26.     Dr. Urquijo asked to be re-assigned a new advisor but was denied.

27.     Dr. Urquijo experienced considerable anxiety and emotional distress because of his advisor's discriminatory animus and her decision to isolate and ostracize him.

28.     The Resident Manual and the Contract do not provide residents with a procedure for reporting or otherwise addressing discrimination experienced during their residency.

29.     Dr. Urquijo applied to other residency programs for his second year, and was accepted into a program in Scottsdale, Arizona, scheduled to begin in July 2022.  Dr. Andazola provided him with a good summative letter to support his application.

30.     However, PHC's Residency Program Director Dr. John Andazola encouraged him to stay and not to transfer to the other program, stating that they all knew how hard he worked.  Dr. Urquijo agreed to remain. However, he soon regretted his decision as Dr. Rachelson continued to ostracize him.

31.     Later, Dr. Urquijo asked to be transferred to the residency program in Alamogordo, New Mexico, telling Dr. Andazola that he was worried about his career and what Dr. Rachelson might be telling the Program's Clinical Competency Committee.

32.     Dr. Andazola told him not to worry and that they all knew how hard Dr. Urquijo works, and that he would be fine.

33.      On March 30, 2023, Dr. Urquijo received a written warning.

34.     Exhibit A to the Contract provides that any report of educational or clinical misconduct by a resident will be followed by an investigation into the matter and the investigation's results will be provided to the resident. **Exhibit 1 at 6-8**.

35.     Dr. Urquijo was not presented with the results of any investigation into the alleged misconduct either before or after he received the written warning, but he affirmatively provided mitigating documentation regarding the cited-to incidents.

36.     The Resident Manual provides for progressive levels of corrective action which provide residents with remediation opportunities, and specific steps for struggling learners, including putting in place a "Success Team" to support the resident and an "Action Plan" with concrete steps and milestones towards achieving remediation, as well as notifying the resident of expectations for remediation. *See, e.g.*, **Exhibit 2**.

37.     The procedures outlined in the Contract and in the Manual were not followed.

38.     On June 12, 2023, Dr. Urquijo had a serious medical emergency that required an unplanned hospitalization and surgery.  Given the circumstances, he was unable to provide notice to his Residency Program before undergoing sedation and surgery.

39.     Upon coming out of sedation that same day, but still under heavy pain medication, Dr. Urquijo notified a supervisory member of the Residency Program, Dr. Mary Alice Scott, that he would be unable to make a meeting with the following morning and explained that he had just undergone unplanned, emergency surgery that had required

hospitalization. Dr. Scott acknowledged his message and said she would discuss it with the Residency Program Coordinator, Donna Madrid.

40.     The following day, still considerably impaired by his illness and surgery, Dr. Urquijo directly notified the Program Coordinator of his surgery.  He also spoke with PHC employees in the human resources department to put them on notice of his surgery and related prescription for pain medication, in order to reschedule a planned drug test.

41.     At no point did any person inform him that he was eligible for medical leave under the Family Medical Leave Act ("FMLA").

42.     One week later, on June 19, 2023 the Residency Program's Director pulled Dr. Urquijo out of his rotation and explained he was doing so because Dr. Urquijo had missed meetings, an emergency room rotation, and a scheduled drug test in the aftermath of the emergency surgery.

43.     Dr. Urquijo explained the circumstances of his medical emergency and also notified the Director that he had not missed any emergency room rotation, providing documentation from the attending physicians of those rotations stating that he had fully participated in the rotations.

44.     Dr. Urquijo was not presented with any findings from an investigation into that alleged conduct that formed the basis for pulling him out of his rotation.

45.     Dr. Urquijo's advisor, Dr. Rachelson, did not contact him to discuss any concerns with his performance that would warrant pulling him off a rotation.

46.     Dr. Rachelson did not contact Dr. Urquijo to provide any feedback or notify him of concerns with his performance, or to discuss any issues regarding his absence in the hours following his emergency surgery.

47.     On June 27, 2023, the Director terminated Dr. Urquijo.

48.     Dr. Urquijo asked for further explanation and the Program Director elaborated that Dr. Urquijo had allegedly missed a rotation and a required didactics meeting. However, both absences had been excused.

49.     The grounds for his termination were clearly pretextual.

50.     The decision to terminate him was influenced by Dr. Rachelson's discriminatory animus towards Dr. Urquijo because of his national origin and accent.

51.     PHC failed to follow its contract with Dr. Urquijo, which requires that prior to termination, a resident must be placed on Probationary Status, with specific goals for monitoring success.

52.     PHC failed to properly investigate the allegations, as required by the parties' contract.

53.     PHC failed to follow the Residency Manual procedures for progressive discipline and opportunities for remediation, as required by the parties' contract. **Exhibit 2**.

54.     PHC failed to follow ACGME's policies for providing formative and summative evaluations and individual remediation plans to support residents who are experiencing educational difficulties.

55.     Dr. Urquijo submitted a letter appealing against the decision but was not permitted to participate in the hearing or provided with any of the materials considered in the hearing.

56.     During this process, Dr. Andazola informed Dr. Urquijo he would provide him with a copy of his residency file but could not do so immediately because the documents supporting his termination and non-renewal of contract were solely in Dr. Rachelson's possession.

57.     Despite the communication described in Paragraph 56, Dr. Urquijo never received any documents documenting the grounds for his termination or any procedures followed by PHC or the Residency Program.

58.     After much delay, on September 14, 2023, Dr. Urquijo was notified that his termination had been upheld and he did "not have a grievable appeal," again with no further explanation.

59.     Dr. Urquijo repeatedly tried to obtain any records related to the disciplinary actions and his dismissal but was either denied or ignored.

60.     Dr. Urquijo repeatedly requested a summative letter summarizing his residency education at PHC, which he needed in order to apply to another residency

program, but was denied or ignored until November 2023. By then, the application period for other residencies was long past.

61.    Dr. Urquijo applied to other residency programs but was denied admission.

62.    Upon information and belief, residency programs denied him admission because he was unable to provide any documentation of the reason for his termination.

63.    PHC refused to respond to inquiries made directly by other residency programs as to Dr. Urquijo and the reasons for his termination, including emails from a residency program director in El Paso, Texas.

64.    Since his wrongful termination, Dr. Urquijo has been unemployed.

65.    Dr. Urquijo has suffered great emotional distress from this experience, including depression, anxiety, and loss of sleep.

## CAUSES OF ACTION

### COUNT I:
### BREACH OF CONTRACT AND BREACH OF IMPLIED CONTRACT

66.    Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

67.    Plaintiff and PHC had a Contract governing his employment that included disciplinary procedures to be followed prior to any termination.

68.     Plaintiff's employment in the residency program was also governed by the Resident Manual and ACGME's Program Requirements, giving rise to implied contracts between Plaintiff and PHC.  These implied contracts supplemented the express Contract.

69.     PHC failed to perform its contractual obligations when it terminated Dr. Urquijo without following the procedures outlined in the Contract or the Resident Manual or those procedures required by ACGME.

70.     PHC acted in blatant and reckless disregard for Dr. Urquijo's rights under the contract and implied contracts.

71.     As a result of PHC's breach of contract, Dr. Urquijo was severely damaged.

72.     Dr. Urquijo suffered lost wages as a resident as a result of PHC's breach.

73.     Dr. Urquijo has been unable to continue his medical education as a result of PHC's breach.

74.     Dr. Urquijo has suffered at least one year of lost wages as a physician by PHC's breach.

75.     Dr. Urquijo's medical career has been delayed by at least one year, representing a serious hardship.

76.     It is unclear if Dr. Urquijo will be able to complete his residency at any other program, given PHC's lack of transparency regarding what transpired.

77.     Dr. Urquijo has accrued legal fees.

78.     Plaintiff now seeks such compensation owed to him to make him whole.

## COUNT II:
## VIOLATION OF TITLE VII

79.     Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

80.     Dr. Urquijo's supervisor Dr. Rachelson held discriminatory animus towards Dr. Urquijo because of his national origin.

81.     Dr. Rachelson deliberately influenced the Program Director to take action against Dr. Urquijo.

82.     She intended that an adverse employment action would be taken against Dr. Urquijo.

83.     The Program Director was motivated to terminate Dr. Urquijo by Dr. Rachelson' influence and did in fact terminate him because of Dr. Rachelson's influence.

84.     This termination was an adverse employment action.

85.     Defendant violated Title VII, 42 U.S.C. §§ 2000e-2(a)(1) and 2000e-2(m), which prohibit discrimination on the basis of race and national origin, which includes discrimination because an individual has the physical, cultural or linguistic characteristics of a national origin group. *See* 29 C.F.R. § 1606.1.

86.     Dr. Urquijo was an "employee" of Defendants as that term is defined in 42 U.S.C. § 2000e(f).

87.     PHC is an "employer" as that term is defined in 42 U.S.C. § 2000e(b).

88.     Dr. Urquijo has suffered loss of sleep, anxiety, and depression stemming from PHC's discriminatory conduct.

89.     Dr. Urquijo dual-filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on January 31, 2024.

90.     On February 2, 2024, the EEOC issued a Notice of Right to Sue letter to Dr. Urquijo, a copy of which is attached hereto as **Exhibit 4**.

91.     Pursuant to 42 U.S.C. § 2000e-5, Dr. Urquijo is entitled to recover all equitable relief, liquidated damages, reasonable attorneys' fees, and costs of the action.

## COUNT III:
## VIOLATION OF THE NEW MEXICO HUMAN RIGHTS ACT

92.     Dr. Urquijo re-alleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

93.     Defendant has discriminated against Dr. Urquijo on the basis of his race and national origin, in violation of the New Mexico Human Rights Act, N.M. Stat. Ann. §§ 28-1-7.

94.     Dr. Urquijo has exhausted his administrative remedies with the State of New Mexico Department of Workforce Solutions, and appeals to this Court from the Human Rights Bureau's Order of Non-Determination, a copy of which is attached herein as **Exhibit 5**, Order of Non-Determination.

95.     Pursuant to § 28-1-13, N.M.S.A., Dr. Urquijo is entitled to all equitable relief, actual damages, and reasonable attorneys' fees.

## COUNT IV:
## VIOLATION OF THE FAMILY MEDICAL LEAVE ACT

96.     Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

97.     Plaintiff was entitled to time off from work under the FMLA. *See* 29 U.S.C. § 2612(a)(1).

98.     Plaintiff was an eligible employee under 29 U.S.C. § 2611(2)(A).

99.     As soon as was practicable, Plaintiff gave notice that he had unplanned, emergency surgery and needed time off as part of his recovery.  An employee is not required to expressly refer to name the FMLA to invoke its protection.

100.    Hospitalization and emergency surgery qualify as a serious health condition.

101.    Defendants' failure to advise Dr. Urquijo of his rights under the FMLA rendered him unable to exercise that right in a meaningful way.

102.    Defendants took an adverse employment action against Dr. Urquijo by pulling him out of his residency rotation and subsequently terminating him.

103.    PHC told Dr. Urquijo that the reason for these adverse actions was his absence stemming from his emergency surgery.

104.    PHC's decision to terminate Dr. Urquijo and otherwise discipline him for missing a work obligation because of his serious medical condition interfered with, restrained, and denied Dr. Urquijo the ability to exercise his rights under the FMLA.

105.    Dr. Urquijo is entitled to damages under 29 U.S.C. § 2617(a), including any wages, salary, employment benefits, or any other actual monetary losses because of Defendant's violations of the FMLA, and to liquidated damages equal to the amount of actual damages plus interest, and to attorneys' fees and costs.

## RELIEF SOUGHT

Plaintiff respectfully prays for judgment against Defendants as follows:

a.    An Award for breach of contract in an amount appropriate to proof adduced at trial, such that Plaintiff is in as good a position as he would have been had the contract been performed, including an award of prejudgment interest from a reasonable intermediate date;

b.    Punitive damages for Defendant's reckless disregard of Dr. Urquijo's rights under his employment contract;

c.    An Award of unpaid wages, salary and other monetary losses, plus interest, in an amount appropriate to proof adduced at trial.

d.    An Award of liquidated damages equal to one hundred percent of the total amount of the wages found to be due, pursuant to the FMLA;

e.    Backpay and Reinstatement in Good Standing;

f.     An Award to pay Plaintiff's reasonable attorney fees and costs pursuant to Title VII and the FMLA, and as a consequential damage stemming from Defendants' breach of contract;

g.     For an Order granting such other and further relief as may be necessary and appropriate.

RESPECTFULLY SUBMITTED this 1st day of May 2024.

/s/ Margot Veranes
Margot Veranes
LUBIN & ENOCH, P.C.
Clara S. Acosta, State Bar No. 154496
Morgan L. Bigelow, State Bar No. 161862
Margot Veranes, State Bar No. 160248
150 Washington Avenue, Ste. 201
Santa Fe, New Mexico 87501
Telephone: (505) 407-0400
Facsimile: (602) 626-3586
Email: clara@lubinandenoch.com
       morgan@lubinandenoch.com
       margot@lubinandenoch.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of May 2024, I electronically filed and transmitted the attached **COMPLAINT** by using the New Mexico File & Serve E-filing Online System.

/s/ Sheri Estrada

# EXHIBIT 1

**RESIDENT PHYSICIAN EMPLOYMENT AGREEMENT**

This Resident Physician Employment Agreement (the "Agreement") is dated as of this the 1st day of July, 2021, by and between PHC-Las Cruces, Inc., d/b/a Memorial Medical Center (the "Hospital"), and Martyn Urquijo, MD (the "Resident").

**RECITALS:**

WHEREAS, Hospital operates an acute care medical facility located in Las Cruces, New Mexico (the "Facility");

WHEREAS, Resident has obtained a postgraduate training license from the New Mexico Board of Medical Examiners; and

WHEREAS,   Hospital desires to engage Resident to provide resident physician medical services and to participate in Hospital's family medicine residency program, and Resident desires to provide and participate in the same, all on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**I. EMPLOYMENT**

The Hospital engages Resident, and Resident accepts such employment as a resident physician in the Family Medicine Residency Program (the "Program") at the Facility on the terms and conditions herein contained.

**II. OBLIGATIONS, COVENANTS, REPRESENTATIONS,<br>AND WARRANTIES OF RESIDENT**

Resident agrees to the following:

2.1    **Resident Services**.  Resident shall act as a resident physician and shall provide medical services to patients of the Hospital, which shall be selected by Hospital physicians.  The director of the Program (the "Program Director") and/or a patient's attending physician may delineate the degree of responsibility expected of Resident for each patient.  In addition, Resident shall also perform such other duties, including, but not limited to, call duty, as directed from time-to-time by the Program Director or the applicable attending physician.  Resident shall, at all times while performing the duties required hereunder, act in accordance with the standards of the Accreditation Council for Graduate Medical Education ("ACGME").

2.2    **Training and Educational Activities**.  Resident shall actively participate in the teaching programs and educational activities of the Hospital for his or her individual educational advancement, under the guidance and direction of the Program Director or the Chief of the Service to which Resident is assigned.  Resident shall also participate in such other continuing medical education activities as may be necessary for Resident to keep reasonably advised of medical advances in and related to family medicine.

2.3    **Clinical Activities and Experience**.  Resident shall work under the direction, supervision, and responsibility of an assigned physician/preceptor.  Resident's duty hours will be designated by such physician/preceptor, though the hours will not limit Resident's ability to participate in or observe special situations as they arise.  If the assigned physician/preceptor is unavailable, he or she shall designate another physician member of the Hospital's medical staff to supervise Resident.  Under the supervision of his or her physician/preceptor, and within the scope and limits of the physician/preceptor's hospital privileges, Resident shall gather medical histories, perform relevant physical examinations, present Resident's findings to the physician/preceptor, and propose clinical assessments and courses of treatment for discussion and approval of the physician/preceptor.  The Hospital acknowledges and agrees that students will have differing levels of experience and ability.  As a result, the physicians/preceptors shall be responsible for assessing the Resident's level of ability and assigning tasks and providing interaction and responsibilities appropriate to such level.

2.4    **Medical Records**.  Resident shall maintain appropriate clinical records and such other reports as may be required by the Hospital and applicable state and federal laws, in accordance with applicable confidentiality requirements, and to the extent required by applicable law.  Such medical records shall be the sole and exclusive property of the Hospital.

2.5    **Administrative Duties**.  Upon request, Resident shall carry out administrative functions for the Hospital and the Program.  With respect to any designated administrative responsibilities, Resident shall report to the teaching physician/preceptor of the appropriate clinic.

Rev. 4/2014

1

**2.6**   **Additional Duties.**  Resident shall perform such additional services as from time to time may be requested by the Hospital which are not inconsistent with the foregoing duties and other terms of this Agreement.

**2.7**   **Qualifications and Licensure.**  Resident warrants and represents to Hospital that Resident has and for the term of this Agreement will maintain a postgraduate training license to practice medicine from the New Mexico Board of Medical Examiners.

**2.8**   **Public Health Certificate**.  All second (2nd) and third (3rd) year Residents shall be required to obtain his/her Public Health Certificate, unless the Resident has a Masters in Public Health degree and such requirement is not required.

### III. COMPENSATION

For and in consideration of the performance by Resident of the services, terms, conditions, covenants and promises herein recited, Hospital agrees and promises to pay to Resident at the times and in the manner herein stated the following:

**3.1**   **Salary.**  In consideration of the services provided by Resident hereunder, Hospital shall pay Resident a base annual salary of Fifty Thousand Four Hundered and 00/100 Dollars ($50,400.00).  Resident's salary shall be payable in such installments as may conform with Hospital's regular payroll procedures.  Hospital shall withhold from Resident's compensation all federal, state and local taxes and fees as is customary.

**3.2**   **Benefits.**  Resident shall receive basic benefits, including vacation and sick days, identical to those provided to all resident physician employees of the Hospital as set forth in the established policies and procedures of the Hospital.  The Hospital shall, in its sole discretion, determine the eligibility for and the nature and extent of such benefits, and any such benefits may be established, modified or eliminated in the sole discretion of Hospital.  Hospital shall pay for and on behalf of Resident all CME and other related activities preapproved by Hospital or designee, up to the then current limit based upon residency year (the "Preapproved CME Payment Benefit").

**3.3**   **Malpractice Insurance.**  During the term of this Agreement, Hospital, at its sole cost and expense, shall provide Resident's medical malpractice coverage, upon such terms and conditions and in such amounts as Hospital deems appropriate.  Resident acknowledges and agrees that the coverage provided by Hospital shall only extend to acts performed by Resident as required by this Agreement, including, but not limited to, Resident on-call duties, and Resident understands that this coverage will not extend to any acts performed by Resident while engaged in the private practice of medicine, whether such private practice is rendered at the Facility or elsewhere, and regardless of whether such acts involve diagnostic or surgical services.  Upon the expiration or earlier termination of this Agreement, Hospital will, at its sole option, either purchase tail coverage or maintain medical malpractice coverage, to cover claims made at any time related to an occurrence during the term of Resident's employment

### IV. TERM AND TERMINATION

**4.1**   **Term.**  The term of this Agreement shall begin on July 1, 2021, and shall end on June 30, 2022.

**4.2**   **Termination by Hospital.**  Hospital may terminate Resident's employment hereunder at any time for cause.  In the event, Resident is terminated for cause, such termination shall be effective immediately upon written notification by Hospital.  Hospital shall have the sole discretion in determining if cause exists,  Cause includes, but is not limited to, the following:

**4.2.1**   death of Resident or total disability of Resident, as defined in Hospital's policies and procedures, or upon inability of Resident to perform the duties required hereunder for a designated period of time in accordance with Hospital's employment policies and procedures;

**4.2.2**   revocation, cancellation, suspension, or limitation of Resident's postgraduate training license to practice medicine in the state in which Hospital is located, or disciplinary action in any state by an appropriate licensing authority;

**4.2.3**   Resident's conviction or a felony or crime of moral turpitude;

**4.2.4**   violation by Resident of any of the provisions of this Agreement or the rules, policies, and/or procedures of Hospital and failure to cure such violation within thirty (30) days of written notice from Hospital;

**4.2.5**   cancellation of Resident's coverage, or Resident's uninsurability, under the terms and conditions of the professional liability insurance provided;

**4.2.6**   Resident's use of alcohol or a controlled substance which materially impairs the ability of Resident to effectively perform Resident's duties and obligations under this Agreement;

**4.2.7**   the determination of Hospital in good faith that Resident is not providing adequate patient care of that the health, safety, or welfare of patients is jeopardized by continuing the employment of Resident;

**4.2.8**   repeated failure by Resident to meet utilization, performance, efficiency, or quality standards established by Hospital;

**4.2.9**   repeated failure by Resident to conform and comply with Hospital's professional requirements concerning maintenance of medical records; and

**4.2.10**   if any of the representations of Resident contained herein are false or incorrect or if any warranty of Resident is breached.

Unless otherwise set forth herein, Resident shall not be entitled to any severance pay upon the termination of this Agreement, Resident hereby waiving any severance pay he might otherwise be entitled to under any personnel policy of Hospital.

## V. MISCELLANEOUS

**5.1**   <u>Ownership of Information; Confidentiality</u>.  All Hospital business, medical and other records, and all information generated by or relating to Hospital or Service management information systems, shall remain the sole property of the Hospital.  The Resident agrees to keep such information strictly confidential.  The Resident shall not duplicate or permit the duplication of or release of any portion of such information except as expressly permitted by the Hospital.  The Resident agrees to comply with all applicable federal, state and local laws and regulations regarding confidential patient information.  Upon termination or expiration of this Agreement under any circumstances, the Resident shall immediately return to the Hospital all such information and materials, and will not thereafter use, appropriate, or reproduce such information or disclose such information to any third party.

**5.2**   <u>Corporate Assets</u>.  Resident agrees that upon termination of employment, all proprietary interest of Hospital in its business assets, tangible or intangible, which Resident deals with or develops during the course of employment, shall remain the sole and exclusive property of Hospital, and in no event shall Resident acquire any interest therein, or right to use the same without the express written permission of Hospital.  Resident agrees that in the event Resident ceases to be employed by Hospital, he or she shall promptly return to Hospital all documents, forms, contracts, lists, and completed work or work in process relating to the affairs of Hospital and any personal property of Hospital in his or her possession at the time of termination.

**5.3**   <u>Non-Discrimination</u>.  Resident shall not refuse to see or treat any patient presenting at the Hospital on the grounds of race, color, national origin, ancestry, religion, sex, marital status, age or disability.

**5.4**   <u>Indemnification of Hospital</u>.  Resident hereby indemnifies and holds harmless Hospital from and against any claim, loss, damage, cost, expense, or liability arising out of or related to any acts of Resident outside the scope of the services to be performed or provided by Resident under this Agreement, specifically including any claim, loss, or damage, cost, expense, or liability excluded from or outside the scope of coverage provided in the malpractice insurance policy referred to in Section 3.3, above.

**5.5**   <u>Regulatory Compliance</u>.  The parties enter into this Agreement with the intent of conducting their relationship in full compliance with applicable federal, state, and local law, including the Medicare/Medicaid Anti-Fraud and Abuse Agreements and the Stark law.  Specifically, this employment arrangement is intended by the parties to comply fully with the exception under the illegal remuneration provisions, relating to compensation payable to employees, set forth in 42 U.S.C. § 1320a-7b and as set forth in the "safe harbor" regulations at 42 C.F.R. § 1001.952(i).  This Agreement is also intended to comply with the Stark employee exception set forth in 42 U.S.C. § 1395nn.  Notwithstanding any unanticipated effect of any of the provisions herein, neither party will intentionally conduct itself under the terms of this Agreement in a manner to constitute a violation of the Medicare and Medicaid fraud and abuse provisions.  Further, if any legislation, regulation or government policy is passed or adopted, the effect of which would be to affect materially Hospital's ability to obtain reimbursement from Medicare or Medicaid due to the existence of any provision of this Agreement, then the parties agree to negotiate in good faith to modify the terms of this Agreement to comply with applicable law.

**5.6**   <u>Government Access</u>.  Upon the written request of the Secretary of Health and Human Services or the Comptroller General or any of their duly authorized representatives, Resident will make available those contracts, books, documents, and records necessary to verify the nature and extent of the costs of providing services under this agreement.  Such inspection shall be available up to four (4) years after the rendering of such services.  If Resident, subject to Hospital's consent, carries out any of the duties of this

Agreement through a subcontract with a value of $10,000 or more over a twelve (12) month period with a related individual or organization, Resident agrees to include this requirement in any such subcontract. This Section 10.2 is included pursuant to and is governed by the requirements of Public Law 96-499, Sec. 952 (Sec. 1861(v)(1)(I) of the Social Security Act) and the regulations promulgated thereunder. No attorney-client, accountant-client, or other legal privilege will be deemed to have been waived by Hospital or Resident by virtue of this Agreement.

     **5.7**    **Assignment.** This Agreement is a contract for professional and specialized services and shall not be assigned by Resident in any manner or by operation of law. Hospital may assign this Agreement by providing prior written notice to Resident.

     **5.8**    **Modification of Agreement.** This Agreement contains the entire understanding of the parties and shall be modified only by an instrument in writing signed on behalf of each party hereto.

     **5.9**    **Governing Law.** This Agreement shall be construed, interpreted, and governed by the laws of the state in which the Hospital is located. The Third Judicial District Court in Las Cruces, New Mexico shall have exclusive jurisdiction over any and all disputes arising out of this Agreement.

     **5.10**    **Notices.** Any notices required or permitted hereunder shall be sufficiently given if personally delivered or sent by registered or certified mail, postage prepaid, or personally delivered, addressed or delivered as follows:

|  |  |
|---|---|
| Resident: | Martyn Urquijo, MD<br>2272 S. Saint Stephen Dr.<br>Tucson, AZ 85713 |
| Hospital: | Memorial Medical Center<br>2450 South Telshor Blvd.<br>Las Cruces, New Mexico  88011<br>Attention: Chief Executive Officer |
| With a copy to: | LifePoint Hospitals, Inc.<br>330 Seven Springs Way<br>Brentwood, Tennessee  37027<br>Attention: Associate General Counsel |

or to such other address as shall be furnished in writing by either party to the other party. Any such notice shall be deemed to have been given, if mailed, as of the date mailed, and, if personally delivered, as of the date delivered.

     **5.11**    **No Waiver.** No waiver of a breach of any provision of this Agreement shall be construed to be a waiver of any breach of any other provision of this Agreement or of any succeeding breach of the same provision. No delay in acting with regard to any breach of any provision of this Agreement shall be construed to be a waiver of such breach.

     **5.12**    **Severability.** The invalidity or unenforceability of any provisions of this Agreement will not affect the validity or enforceability of any other provision.

     **5.13**    **Survival.** Any provisions of this Agreement creating obligations extending beyond the term of this Agreement will survive the expiration or termination of this Agreement, regardless of the reason for such termination.

     **5.14**    **Headings.** The headings used herein are for convenience only and do not limit the contents of this Agreement.

     **5.15**    **Grievance Policy** Any complaints lodged that involve Resident shall be handled pursuant to the Grievance Policy attached hereto as Exhibit A.

     **5.16**    **Entire Agreement.** This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof. The terms of this Agreement, including but not limited to any provisions affecting medical staff privileges at the Hospital, will take precedence over any inconsistent terms which may be found in the Hospital's medical staff bylaws or other documents as they now exist or as they may be amended in the future.

[signatures appear on following page]

IN WITNESS WHEREOF, Hospital and Resident have duly executed this Agreement as of the dates set out beneath their respective signatures, and hereby certify that:

1) I have reviewed the Agreement described above;
2) The compensation arrangement is established at fair market value for the services to be rendered;
3) The Agreement covers all of the services to be provided by the Resident (and if the Resident is or includes a physician, it also includes all the services provided by any immediate member of the physician's family);
4) There are no agreements or understandings, whether written or oral, that condition the compensation on the volume or value of any referrals or other business generated between the parties; and
5) I will verify that the required services are rendered prior to payment; and
6) I fully understand that this Agreement shall not be made effective or legally binding upon Hospital, or any officer, director, employee or agent thereof, unless and until it has been reviewed and approved in writing by Hospital's Division President and Legal Counsel.

RESIDENT:

Martyn Urquijo, MD

By: _____

Title: _Resident Physician_____

Date: _06/29/2021_____


EMPLOYER:

PHC-Las Cruces, Inc. d/b/a Memorial Medical Center

_____
Hospital Chief Executive Officer

_____
Date

<u>**Exhibit A**</u>

**COMPLAINTS INVOLVING RESIDENTS, EDUCATIONAL DIFFICULTIES, AND MISCONDUCT**
<u>**– RESOLUTION PROCESS, INCLUDING DISCIPLINE OR DISMISSAL –**</u>

*Overview*

Episodically, complaints are lodged regarding residents during the discharge of their educational, clinical, or other responsibilities. Such complaints offer the opportunity to provide residents with additional insight into the nature of their task and profession. However, if a complaint is to be handled in a constructive manner, the resident must be presented with well-researched findings and documented findings about the circumstances of the complaint. This research must include both a review of the conduct of the resident and a determination as to the appropriateness of the conduct in question. Once the appropriateness of the conduct is determined, a fitting way of encouraging appropriate conduct must be developed and implemented. This document outlines the process to be followed at the Southern New Mexico Family Medicine Residency Program for the investigation, documentation, and resolution of complaints lodged against residents.

*Descriptions Of Misconduct*

Certain types of conduct are not in the best interest of the resident or the program. Where such conduct occurs, it should be dealt with in an expeditious, appropriate, and fair manner. There are four types of misconduct of particular interest to the program: Educational Misconduct; Clinical Misconduct; Organizational Misconduct; Personal Misconduct. The following lists are intended as examples and are not comprehensive. Other behaviors may be defined as misconduct by the faculty, if the behaviors are deleterious to the resident or the program.

1. Educational misconduct: Residents are enrolled in the program in order to provide them with training that enables them to become proficient family physicians. In order to accomplish the task of becoming proficient, the best efforts of the resident are required. Unless mitigating circumstances are present, a resident is in error and commits an act of education misconduct when the resident:

    a.  fails to attend conferences as required
    b.  fails to be at rotations as scheduled
    c.  is disruptive or abusive towards faculty or senior residents providing teaching
    d.  fails a rotation, required or elective, or any other portion of the requirements of the program
    e.  performs at less than the 25% on the in-service examination

2. Clinical misconduct: Residents learn during the care of patients as well as in classroom settings. In order to become proficient at providing care to patients, the resident must follow patients in a longitudinal and continuous fashion. The bulk of this care is provided in the assigned family medicine clinic. Additionally, the resident must care for patients while on outside rotations, under the supervision of appointed faculty members. Unless mitigating circumstances are present, a resident commits clinical misconduct when the resident:

    a.  fails to be on time for clinic as scheduled
    b.  fails to see patients in the clinic in a timely manner, ending on time as scheduled
    c.  is rude or otherwise discourteous to patients
    d.  fails to follow on critical needs of patients, such as labs, referrals, etc.
    e.  acts in a manner that exceeds the authority for patient care provided by faculty or is otherwise insubordinate to faculty
    f.  acts in a manner not in accordance with the licensing and behavioral standards established by the State of New Mexico

3. Organizational misconduct: Any large organization has procedures and policies that allow the institution to coordinate its efforts and activities in a productive manner. The resident, upon graduation, will invariably be involved with various large organizations. It is important that the resident learn behaviors that are appropriate to the welfare of the organization. Unless mitigating circumstances are present, a resident will have committed organizational misconduct if the resident:

    a.  creates an environment that is hostile to the productive work of others in the organization
    b.  does not comply with medical staff rules or organizational Policies and Procedures
    c.  is not available as directed for call

4. Personal misconduct: In general the activities of the resident away from the program are not of immediate or legitimate concern to the program. However, certain actions are such that they lead to a sense of misconduct in the resident's activities

Rev. 4/2014                                                                                                                        6

with the program. Activities that generate a sense of misconduct within the program then become of concern. There are certain other, primarily criminal, activities that clearly can not be tolerated by the Program. Unless mitigating circumstances are present, a resident will have committed personal misconduct if:

a.   the resident is found guilty of a felony charge or a crime of moral turpitude. Residents who have been charged with such offenses may also be investigated by the Program
b.   the resident abuses alcohol or drugs, unless the resident voluntarily seeks treatment prior to initiation of an investigation for misconduct

### Investigation Of Misconduct

If a verbal or written complaint is received by the Program Director, the Program Director will assign an investigating faculty member. The investigating faculty member is to conduct an expedient investigation into the nature of the complaint. The investigation may include interviewing witnesses, including the involved resident, to any action or event that precipitated the complaint. The investigation is to focus on the specifics of the event or action. A written report is to be prepared, and this report will be transcribed by the Program Director's support staff from dictation or notes provided by the investigating faculty member.

### Program Director Action Following Investigation

After review of the independent faculty investigation, the Program Director will meet with the resident in the presence of the resident's advisor. If the resident's advisor is not available, the meeting will nevertheless proceed with another faculty member and the Chief Resident present.  The Program Director will review evidence of the investigation and hear any statements the resident wishes to make. Following this, the Program Director will decide what action will be taken. Should an adverse action be taken, the resident has the right to appeal this action as outlined in the Residency Manual.

In the extended absence of the Program Director, another faculty member may act in the Program Director's behalf. In such case the resident's advisor and another member of the residency faculty must be present.

### Recording Of Action

Those who have lodged a complaint regarding a resident will be notified, either in writing or verbally as to the action taken.

Where a resident is found to have committed misconduct, the Program Director will notify the faculty and residents of the program in writing of this finding. The name of the resident will not be used in this communication unless the findings were of such significance that dismissal or suspension was taken as an action. A resident found to have committed misconduct will have a permanent entry made in their resident training file that denotes this finding and the basis for it.

Where a complaint regarding a resident is found to be without substance, there will be no entry into the resident's training record. The investigation and summary of action will however be retained for at least three (3) years, and may be used to establish a pattern of misconduct if further complaints similar to the original complaint are lodged.

### Educational Failure To Perform

If during the semi-annual, the consensus of the faculty is that a resident has not mastered the competencies or the skills expected for his or her level of training, the resident will be considered to be in educational difficulty.  Upon this determination, the resident's advisor will meet with the resident to review the concerns, determine the resident's interpretation of the situation, and formulate a plan of remediation. This meeting and plan will be documented in the resident's file and discussed with the Program Director. The plan will include specific educational goals and expected outcomes and a time frame for completion. The resident and his or her advisor will meet frequently during this time to monitor the resident's progress.

### Probation

If the Program Director, in consultation with the faculty, determine that a resident's misconduct or educational difficulty are severe enough to warrant further action, the resident may be placed on Probationary Status.  The Program Director will notify the resident of

this decision, along with specific goals, a plan for monitoring the resident's progress, and a fixed time, after which the resident's progress will be re-evaluated.

*Non-Renewal Of Contract*

If the Program Director, in consultation with the faculty, determines that a resident's performance or mastery of required competencies or expected skills is not up to the program's standards, the Program Director may choose not to renew the resident's contract for the coming year. Alternatively, the Program Director may require remediation, including repetition of the year just completed.

*Termination Of Resident's Employment*

If a resident has been on probation and has not completed the terms of his or her probation to the satisfaction of the Program Director, the Program Director, with consultation from the faculty, may terminate the resident's contract.

*Right Of Appeal*

If a resident has been the subject of any disciplinary action, including termination, he or she has the right to appeal the decision. The appeal process is as follows:

a. The appeal will be submitted within ten (10) calendar days following the disciplinary action.

b. The appeal will be in writing and must contain a statement of the disciplinary action, the charges upon which it is based, and the resident's response to the charges and action.

c. The appeal will be filed with the Director/Chief Medical Officer.

d. The appeal will be heard by a committee consisting of (1) the grievant's Program Director, or, if the Program Director is personally involved in the subject, he will appoint an alternate to serve in his place, and (2) a person mutually acceptable to the other members of the committee, but such person must be a teacher in the field of clinical medical practice, and (3) Director of Human Resources. The Director/Chief Medical Officer will be the Chairman of the committee, will attend to the administrative matters and may participate in the deliberations, but will not have a vote. If the committee has not been formed within ten (10) days of the filing of the concern, the Director/Chief Medical Officer will make the necessary appointment as soon as possible.

e. The committee will hear the case as promptly as is practicable with due notice to all parties. The parties agree to exert their best efforts to commence the hearing within twenty-one (21) calendar days after the concern is filed. Evidence and argument may be submitted in writing or personally, or both. The committee shall keep an informal record of the case and may tape record any oral presentation.

f. The committee will decide whether the subject is grievable or not. At such time as the committee decides that the matter is not grievable, the Resident will be so notified and the proceedings stopped. The decision of the committee in this regard is final.

g. The committee is authorized to decide the concern and to provide for a remedy to carry out its decision.

The appeal will be decided by a majority vote of the voting members of the committee. The decision will be in writing and will be delivered immediately to the Resident personally, or if he or she is not immediately available, a copy of the decision will be placed in the Resident's mail box at Memorial Medical Center and another copy will be sent by Certified Mail to the Resident's address of record kept at Memorial Medical Center. The decision of the committee is final, including review of termination decisions made by the Program Director. Termination decisions are not subject to further appeal, such as described in the MMC HR Policy Manual or University of New Mexico grievance procedures.

# EXHIBIT 2



Southern New Mexico
Family Medicine
Residency Program
Established in 1996

# RESIDENT MANUAL

Updated 07/12/2021

# CONTENTS

RESIDENT MANUAL ...................................................................................................................... 0

CONTENTS .................................................................................................................................... 1

I.   Introduction ......................................................................................................................... 5

   Mission/Vision ...................................................................................................................... 5

      LifePoint Hospitals/Memorial Medical Center ................................................................. 5

      Southern New Mexico Family Medicine Residency Program ........................................... 5

   Overall Educational Goals: ................................................................................................... 6

II.   Residency Life Cycle: Eligibility, Appointment, Promotion, Transfers, Graduation ............ 6

   Eligibility: ............................................................................................................................. 6

      Medical School Requirements ......................................................................................... 6

      USMLE/COMLEX Requirements ....................................................................................... 6

      Five Year Rule .................................................................................................................. 7

      Visas ................................................................................................................................ 7

      Selection Criteria ............................................................................................................ 7

      Appointment ................................................................................................................... 7

      Resident Promotion ........................................................................................................ 7

      Resident Transfers .......................................................................................................... 9

   Job Descriptions: PGY1, PGY2, PGY3, Chief Residents ......................................................... 9

      PGY1 ................................................................................................................................ 9

      PGY2 .............................................................................................................................. 10

      PGY3 .............................................................................................................................. 10

      Chief Residents .............................................................................................................. 11

III.   House Staff Policies and Regulations ............................................................................... 13

   Policies for Supervision ...................................................................................................... 13

   Policies for Transitions of Care/Handoff ............................................................................ 16

      Background: ................................................................................................................... 16

      Procedure: ..................................................................................................................... 16

   Policies for Clinical Experience and Education Work Hours ................................................ 18

      Maximum Hours of Clinical and Educational Work per Week ........................................ 18

      Mandatory Time Free of Clinical Work and Education .................................................. 18

Maximum Clinical Work and Education Period Length ........................................................ 19

In-House Night Float ............................................................................................................. 19

Policies for Resident and Faculty Well-Being ................................................................................ 19

Fatigue ................................................................................................................................... 19

Resident and Faculty Well-Being .......................................................................................... 19

Moonlighting Policy ...................................................................................................................... 20

Licensing, Credentialing, Contracts, and Certifications ................................................................ 20

USMLE Step III and Licensing ................................................................................................ 20

DEA Number ........................................................................................................................... 21

New Mexico Training License ................................................................................................. 21

Contracts Residency Training Requirements for Board Certification Eligibility.................... 21

At the end of training, the Program Director is expected to sign, on behalf of the program, that the resident has met all requirements for board eligibility and is ready for autonomous practice......... 22

Certifications .......................................................................................................................... 22

Hospital Coverage and Call .......................................................................................................... 22

Call ......................................................................................................................................... 22

ER Response Times ................................................................................................................. 22

Call Changes ........................................................................................................................... 22

Jeopardy Coverage System .................................................................................................... 23

On-Call Quarters .................................................................................................................... 23

FMS Cap .................................................................................................................................. 23

Family Leave Policy and Time Away from Training ....................................................................... 23

Vacation, Illness, and Other Short Term Absences ............................................................... 23

CME ........................................................................................................................................ 24

Time Allowed for Family Leave of Absence ........................................................................... 25

Required Resident Educational Experiences ................................................................................ 26

Required .................................................................................................................................. 26

Elective ................................................................................................................................... 26

Procedures ............................................................................................................................. 26

Required Experiences: ........................................................................................................... 27

Other: ..................................................................................................................................... 27

Patient Care Continuity .......................................................................................................... 27

Research..............................................................................................................28

Conferences (Didactics, Grand Rounds, Tumor Board, Board Review etc.) ....................28

Miscellaneous ............................................................................................................28

House Staff Offices ................................................................................................28

Meals/Cafeteria ....................................................................................................29

Mail/Email ............................................................................................................29

Cell Phones and Laptops ........................................................................................29

Reimbursement Policy ...........................................................................................29

Attendance Policy ..................................................................................................29

Checkout Process for Vacation, Away Electives, and Graduation ...............................30

IV.    Evaluation and Remediation Policy ......................................................................30

Evaluation ..................................................................................................................30

IEP .......................................................................................................................30

New Innovations ....................................................................................................31

360° Evaluations.....................................................................................................31

Rotation Evaluations ..............................................................................................31

Clinical Competency Committee (CCC) .....................................................................31

Identification of struggling learner .............................................................................34

Reassessment.............................................................................................................34

6. Outcome ...............................................................................................................35

Levels of Remediation/Corrective Action ....................................................................36

Coaching ...............................................................................................................36

Written Counseling Notices ....................................................................................36

Written Warnings ..................................................................................................36

Concern Status/Action Plan ....................................................................................36

Administrative Leave (Suspension)...........................................................................36

Administrative Leave (Suspension) Pending Final Determination.................................37

Termination or Non-renewal of Contract ..................................................................37

Due Process...............................................................................................................37

V.     Assistance: Ombudsman, Counseling Services ......................................................38

Ombudsman...............................................................................................................38

Counseling Services and Disability Accommodations.....................................................38

VI.    Institutional (LifePoint/MMC) Policies ........................................................................... 39

VII.    ACGME/GMEC Policies ................................................................................................ 39

   Policy for Disaster or Interruption of Patient Care .......................................................... 39

      Communication with the ACGME: .................................................................................. 39

      Continuation of Resident Education Options: ................................................................ 40

      Changes in Participating Sites and Resident Complement: ............................................ 40

   Policy for Experimentation and Innovation .................................................................... 41

      ACGME Review, Review Committee Appraisal, Monitoring ........................................... 41

   Policy for Closure of Program ......................................................................................... 42

      Communication with the ACGME ................................................................................... 42

      Continuation of Resident Education ............................................................................... 42

   Non-competition/Restrictive Covenant Policy ................................................................ 42

   Policy on Interactions Between Vendor Representatives/Corporations and Residents and ACGME-Accredited Programs ...................................................................................................... 43

VIII.    FAMILY MEDICINE CENTER POLICIES ........................................................................ 43

   Hours of Operation ......................................................................................................... 43

   Clinic Attendance and Punctuality .................................................................................. 43

   Patient Termination Criteria ........................................................................................... 43

   Patient No Show Policy ................................................................................................... 43

   Medical Chart Completion/ FMC Lag Report Procedure .................................................. 43

IX.    Addendum: Definitions .............................................................................................. 44

ACKNOWLEDGMENT ............................................................................................................ 48

X.    Appendices ................................................................................................................ 49

   Appendix A: Thresholds .................................................................................................. 49

   Appendix B: Steps in Remediation Process ..................................................................... 51

   Appendix C: Remediation process flow diagram ............................................................. 53

   Appendix D: Remediation Strategies for Each Deficit Type (Plan Creation) ....................... 53

   Appendix E: Sample Action Plan ..................................................................................... 58

   Appendix F: Competencies and Reassessment Methods .................................................. 61

# I.    Introduction

Welcome to the Southern New Mexico Family Medicine Residency Program! We are excited that you are joining us! These next few years will be challenging and enriching, both professionally and personally. It is during these years that you will truly develop into a physician, and thus, it is our responsibility to provide you with the resources and the guidance you require to attain your goal. Even though we are here to help and guide you along your journey, it is ultimately YOUR responsibility to provide the necessary effort to reach your destination.

Upon entering residency, you may feel overwhelmed and lost with the new environment, the personnel, and the new responsibilities. This manual will help guide you. It includes the specific policies and procedures that you must follow in order to successfully complete your training here.

Many of the policies, duties and responsibilities described within this manual are decreed in state law, others are ACGME requirements, others are policies of this institution, and finally others are obligations within the patient-physician relationship.

These policies and procedures are intended to protect the welfare of the patient and to ensure a positive learning environment for the resident. All faculty and staff are here to support you as you learn the policies and procedures and continue your medical education here.  Please ask for help.

## Mission/Vision

### LifePoint Hospitals/Memorial Medical Center
Our Mission:
To care for our community with compassion and respect.

Our Vision:
To be a place where:
Patients choose to come for health care.
Physicians want to practice.
Team members want to work.

### Southern New Mexico Family Medicine Residency Program
**Mission:** We teach, collaborate, lead, and inspire to transform the education and health of our whole community

**Vision:** To transform health care education and delivery to be socially responsible and eliminate health disparities in New Mexico.

5

Checkout Process for Vacation, Away Electives, and Graduation

### *a)      Vacation, CME or Away Rotation Check Out*

Before a resident leaves for either vacation or an away/rural rotation, they must meet the following requirements.

- The resident must be cleared through medical records by obtaining a signature from both the clinic AND the hospital medical records personnel.
- The resident must review both the call and clinic schedule to ensure that all calls and clinics are covered.
- The resident must identify a covering physician to care for his or her patients' needs in his or her absence including Rx refills. (as per team assignment)
- The resident must leave an emergency phone number where they can be reached.  This number will only be used in case of emergency.
- The resident must place an out of office notice on eCW and on their Outlook email account.
- The resident must ensure that they clear all chart lag, phone notes, duty hours and paperwork from their mailbox.

### *b)      Graduation Check Out*

Prior to graduation:

- The resident must be cleared through medical records by obtaining a signature from both the clinic and the hospital medical records personnel.
- The resident must sign off nursing home patients to a new resident with a verification signature from the faculty in charge of overseeing the nursing home visits.
- The resident must turn in laptop, token, cell phone, keys, and ID Badge to the Academic Office.
- The resident must clear mailbox, desk and office of all personal belongings and have mail forwarded to the appropriate address.

# IV.    Evaluation and Remediation Policy

## Evaluation

The key to successful education of residents is a well thought out and implemented evaluation system. The evaluation system should be designed in a manner that provides timely feedback to residents, so that they can improve their skill levels and act upon identified weaknesses. This is done by providing direct, specific and actionable feedback.  Currently the residency uses many evaluation tools listed below.

### IEP

The resident's advisor will conduct quarterly summary cumulative evaluations (Individual Educational Plans or IEP's).  The advisor will put these evaluations in writing and discuss them with the resident. The resident will be required to acknowledge the evaluation. The advisor will evaluate the resident's knowledge, skills, clinical performance and professional growth and will update the CCC on the

resident's progress. The advisor may meet with a Resident more frequently, at the advisor's, or at the Resident's discretion.

## New Innovations

New Innovations is an online tool for residency management. Evaluations and procedure logs are one component of this online tool.  The resident is expected to record procedures and specific learning experiences in New Innovations including nursing home visits, didactics, management of health systems hours etc.  Also many of the rotational evaluations will be in New Innovations.

## 360° Evaluations

360° evaluations are evaluations from patients, nursing/support staff and peers that focus on areas of the resident's sphere of influence other than faculty evaluations of resident performance. This type of evaluation will provide a better picture of the resident's functioning in the medical setting.

## Rotation Evaluations

At the end of each clinical rotation, the precepting physician, prescribing psychologist or midwife, whether residency or community faculty, will complete an evaluation form for the resident. The evaluation form includes rotation-specific objectives, as well as areas for general discussion of the resident's performance. Rotation evaluations will be reviewed in the IEP.

## Clinical Competency Committee (CCC)

The purpose of the Clinical Competency Committee (CCC) is to conduct meaningful assessments of the residents based on multiple sources of information including formative and summative evaluations, milestones-based assessments, and 360 degree evaluations in compliance with the ACGME requirements. These assessments are meant to provide meaningful performance evaluation and feedback to allow the program director to make informed decisions regarding resident progress including promotion, remediation, and dismissal. The role of the CCC is to make a consensus recommendation on the progress of each resident in achieving the relevant milestones.

- In accordance with the ACGME requirements, the program director will appoint the Clinical Competency Committee. At a minimum the Clinical Competency Committee must be composed of three members of the program faculty. The program director may appoint additional members of the Clinical Competency Committee. These additional members must be physician faculty members from the same program or other programs, or other health professionals who have extensive contact and experience with the program's residents in patient care and other health care settings. While not part of the CCC, the program director may attend the meeting and be available for clarification, consultation, etc.

The Clinical Competency Committee will:

- Meet quarterly in September, December, March and June of each year.  The CCC may meet more frequently as required by the needs of residents placed on concern status.
- Review all resident evaluations quarterly after the completion of the quarterly individual educational plans (IEP's).

- Assist the faculty advisor in creating and implementing action plans for resident in concern status.
- Prepare and assure the reporting of milestones evaluations of each resident semi-annually to the ACGME;
  - Reporting windows are:
    - November 1-December 31
    - May 1-June 15
- Set thresholds for promotion, remediation and dismissal.  Interventions a program might consider include assigning a mentor with expertise in a given area of deficiency, additional required readings, sessions in a skills lab, and/or added rotations in a given area.  If, after remediation, a resident still fails to advance sufficiently on one or more milestones, the CCC may consider remedies such as extending the length of the educational experience, or counseling the resident to consider another specialty or profession.
- Advise the program director by June and December of each year regarding resident progress, including promotion, remediation, and dismissal.
- Generate a report/recommendation letter to the program director for each resident.

The program director and/or the program coordinator will report the aggregate, de-identified information for all residents in the program to the ACGME via the ADS system.

The Program Director has final responsibility for the program and trainees' evaluation and promotion.

| Evaluation | When They Occur | Who is Responsible for Administration | When They Will Be Reviewed with the Resident | Who Will Review with Resident |
|---|---|---|---|---|
| **Rotation evaluations** | After each block rotation | Rotation faculty member | At each IEP | Faculty advisor |
| **IEP** | Quarterly | Faculty advisor | At each IEP | Faculty advisor |
| **CCC/Milestones** | Quarterly | CCC | At each IEP | Faculty advisor |
| **Peer-evaluations** | After each block rotation | Program Coordinator | At each IEP | Faculty advisor |
| **Self-Milestone evaluations** | Quarterly | Resident will self-evaluate with direction by program coordinator | At each IEP | Faculty advisor |

| **360 evaluations** | Quarterly | Program Coordinator | At each IEP | Faculty advisor |
| **ITE** | Annually in October | ABFM and Program Coordinator | Annually in didactics | Program Director |

## Identification of struggling learner

The residency program has developed specific steps to provide support for learners who are struggling in any of the six core competencies. The identification of the struggling learner can happen in several ways:

1. By meeting outlined threshold
2. By self-referral
3. By faculty identification of struggling resident
4. Referral from other source

The steps faculty will take steps to address a voiced concern of a learner

Step 1. Request documentation and examples
Step 2. Notify and discuss the learner's performance with ONLY those who need to know
Step 3. Confirm the concern and collect more information as needed
Step 4. Decide
- Is this a trend that needs intervention?
- Is this an isolated serious problem that needs intervention?
- Does this concern warrant only monitoring at this point?
Step 5. Make sure the learner receives direct feedback of the deficit(s)
- Often, the faculty advisor provides this feedback You may have to do this yourself
- Examples of poor performance are essential, especially if the faculty advisor wasnot present when the deficit was noticed.

Please see Appendix A for specific thresholds utilized by faculty to determine whether a resident needs additional support.

When it is determined that thresholds for additional support have been met, the struggling learner is referred to the CCC to determine next steps. Please see Appendix B for details on the steps in this process and Appendix C for a flow diagram.

The CCC will determine the need for an action plan and/or a success team. Please see Appendix D for details on how the CCC, faculty advisor, and/or success team will develop an action plan. Please see Appendix E for a sample action plan.

## Reassessment

Following remediation, the advisor or success team must formally assess the learner for the following criteria.

1. Has the resident shown significant improvement and caught up to her/ his level of training in the previously deficient competency(ies)?
2. Is the improvement sustainable?

The advisor or success team can reassess using any of the following assessment methods:

- Repeat the clinical block, or portion of the block with a new team
- Standardized patient encounters
- Objective structured clinical examinations
- Mini-clinical evaluation examinations
- Brief structured clinical examinations
- Simulation
- Directly observed encounters with actual patients
- Clinical evaluation exercises
- Multiple choice exams
- Written or web-based assessments
- Chart reviews and chart-stimulated recall
- Supervisor or peer observations
- Multi-source evaluations
- Patient and procedure logs
- Critique of journal articles
- Responses to self-assessment

See Appendix F for a table linking competency to reassessment methods.

## 6. Outcome

There are two possible main outcomes of remediation.  One is successful remediation and return to good standing. The other is failed remediation with continued remediation, possible withdrawal, or termination. The process of reevaluation will provide the advisor and success team information to determine return to good standing (this will be the case for most learners).  However, the difficult decision to stop remediation must be discussed in some cases. Below are some examples taken from *Remediation of the Struggling Medical Learner*, by Jeannette Guerrasio, MD published by the Association for Hospital Medical Education.

1. The learner is working at her/his fullest capacity and not making significant progress. This assumes that a complete remediation process has occurred (identification, triage and action plan creation and reassessment), and has discovered and attempted to treat all possible causes of her/his poor performance.
2. The learner is not invested in her/his remediation, despite multiple attempts to get her/him on board and address her/his individual barriers.
3. The learner is non-compliant with treatment of a severe psychiatric disorder or substance abuse or has a mental health or physical health problem that makes them unfit for duty (i.e. psychosis or seizures with stress or fatigue or accruing too many absences to be reliable or to learn).
4. The learner has timed out.
   a. Failed USMLE Step III 3 times and therefore has delayed training.
   b. Repeated more than 1 year of residency.
   c. Failed to advance in residency after more than 1 year of remediation.
   d. Institution will not support resident extension due to financial concerns.

## Levels of Remediation/Corrective Action

When the issue a learner has requires corrective action, that action will happen at progressive levels as outlined below until remediation is successful or until termination.

### Coaching

A non-threatening discussion between the resident and the resident's supervising physician or faculty advisor intended to improve overall performance.  Coaching is used when work performance, academic performance, or other work-related conduct is not satisfactory.  During coaching, the attending should point out the areas for improvement, suggest corrective action and ask the resident for an agreement to improve. The attending should document this in a memorandum of the discussion and place it in the resident's file.

### Written Counseling Notices

The least severe form of formal remediation, written counseling notices are given to residents to notify the resident of the specific nature of the problem, what they must do to improve, and what action will be taken if the problem is not corrected. If the conduct is recurrent, or if the conduct is such that bypassing coaching is justified, this level of remediation may be used first. The attending or faculty advisor should maintain documentation of the counseling, including the date, persons present, and substance of the discussion and place it in the resident's file.

### Written Warnings

Written warnings may be given for a violation of a work rule(s) or regulation(s). At this level, the Program Director should mandate corrective action and the expected timeframe in which the resident must take corrective action (see Concern Status).  Such written warnings may include a final notice to the resident that disciplinary action, up to and including termination, may be taken if the problem is not corrected.

### Concern Status/Action Plan

The CCC may place a resident may be placed on concern status for a period of up to 6 months. The program director will notify the Designated Institutional Official (DIO) that the resident is on concern status. The program director will also notify the resident of this decision. This notification will include specific goals, a plan for monitoring the resident's progress, and a fixed timeline, after which the resident's progress will be re-evaluated.

During the period of concern status, the faculty advisor shall evaluate the resident at least monthly and shall inform the resident in writing of the deficiencies and the expectations for remediation.  The faculty advisor will notify the program director and the CCC of the resident's progress, and the CCC may remove the resident from concern status by written notice with copies to program director.

### Administrative Leave (Suspension)

Administrative Leave (Suspension) from work, with or without pay, may be imposed when:

- Time is required to investigate the circumstances of a problem
- When a resident's presence on the job constitutes a threat to personnel or clients

- Where the alleged misconduct or offense is of such severity that termination may occur
- When an employee fails to correct performance after having been previously warned.

The Program Director or other authorized official may suspend a resident pending a decision as to the appropriate disciplinary action to be taken, if any.

### Administrative Leave (Suspension) Pending Final Determination

Administrative Leave (Suspension) Pending Final Determination from work, without pay, can be imposed prior to any final disciplinary action of termination being taken. This step will allow the residency/facility representatives, including Director of Human Resources, or designee, to discuss the next step of action and request the resident to provide any information, such as written documentation, prior to a final decision being made.

### Termination or Non-renewal of Contract

Termination from work may be imposed when a resident fails to correct or improve his/her behavior or work performance, or when the residency/facility determines that the seriousness of the resident's behavior warrants termination.

If a resident has been on concern status and has not completed the terms of his or her action plan to the satisfaction of the CCC, the program director, with consultation from the faculty, may terminate the resident's contract.

If the program director, in consultation with the faculty, determines that a resident's performance or mastery of required competencies or expected skills is not up to the program's standards, the program director may choose not to renew the resident's contract for the coming year.  Alternatively, the program director may require remediation, including repetition of the year just completed.

## Due Process

If a resident has been the subject of any disciplinary action, including termination, he or she has the right to appeal the decision.  The appeal process is as follows:

- The resident must submit the appeal within ten (10) calendar days following the disciplinary action.
- The appeal must be in writing and must contain a statement of the disciplinary action, the charges upon which it is based, and the resident's response to the charges and action.
- The residency program will file the appeal with the DIO.
- The appeal will be heard by a committee consisting of (1) the grievant's Program Director, or, if the Program Director is personally involved in the subject, an alternate to serve in his/her place will be appointed, and (2) a person mutually acceptable to the other members of the committee, but such person must be a teacher in the field of clinical medical practice, and (3) Director of Human Resources. The DIO will be the chair of the committee, will attend to the administrative matters, and may participate in the deliberations, but will not have a vote. If the committee has not been formed within ten (10) days of the filing of the concern, the DIO will make the necessary appointment as soon as possible.

- The committee will hear the case as promptly as is practical with due notice to all parties. The parties agree to exert their best efforts to commence the hearing within twenty-one (21) calendar days after the concern is filed. Evidence and argument may be submitted in writing or personally, or both. The committee shall keep an informal record of the case and may tape record any oral presentation.
- The committee will decide whether the subject is grievable or not. If the committee decides that the matter is not grievable, the resident will be so notified and the proceedings stopped. The decision of the committee in this regard is final.
- The committee is authorized to decide the concern and to provide for a remedy to carry out its decision.

The appeal will be decided by a majority vote of the voting members of the committee.  The decision will be in writing and will be delivered immediately to the resident personally, or if he or she is not immediately available, a copy of the decision will be placed in the resident's mail box at Memorial Medical Center and another copy will be sent by certified mail to the resident's address of record kept at Memorial Medical Center. The decision of the committee is final, including review of termination decisions made by the Program Director. Termination decisions are not subject to further appeal, such as described in the MMC HR Policy Manual or grievance procedures.

## V.   Assistance: Ombudsman, Counseling Services

Residents may consult any faculty or staff member in obtaining information and informal assistance.  For more formal issues, questions or complaints, residents should pursue assistance by taking the steps listed below:

1.  Talk to the chief resident
2. Talk to the Program Coordinator.
3. Talk to your faculty advisor.
4. As a last resort, the Program Director will get involved to resolve the situation.

### Ombudsman

If residents feel uncomfortable talking to any member of the residency program, they may speak to the Ombudsman.  The Ombudsman has agreed to help the residents in any manner where the resident does not feel comfortable utilizing the faculty or staff.  Residents should only speak with the Ombudsman if they feel the options listed above aren't appropriate.

> CONTACT INFORMATION:        Jie Luo, MD
> (575) 382-9292
> jluo@bahcnm.org

### Counseling Services and Disability Accommodations

To ensure that all residents have access to adequate behavioral health services as needed as well as accommodations for any disabilities, the program offers the following resources:

| | Comments indicating lack of independent learning |
|---|---|
| 9.  Systems-Based Practice | Any one of the following... <br><br> 2 or more evaluations with a rating below 2 |
| 10.  Mental Well-being | Any one of the following... <br><br> Inconsistent performance <br><br> OR <br><br> Not demonstrating improvement/Not receptive to teaching <br><br> OR <br><br> Mental Health impairing work performance |
| 11. Milestones | Any one of the following... <br><br> Below peers on more than 70% of sub-competencies established in CCC reviews. <br><br> Failure to improve over 2 quarterly evaluations in areas that are below expectations |

## Appendix B: Steps in Remediation Process

1. First a struggling learner is identified and referred to the CCC for triage.  This is done either by:
   a. Self-referral
   b. Meeting specified threshold identified above, through evaluation process outlined above
   c. Referred by faculty member, program director or CCC

2. Next the CCC will triage the referral to determine if the concern is clinical, non-clinical, or complex
   a. Clinical (isolated)
      i. Medical knowledge
      ii. Clinical skills
      iii. Clinical reasoning and judgment
      iv. Systems based practice

      b.   Non-clinical (isolated)
- i. Time management and organization
- ii. Interpersonal skills
- iii. Communication
- iv. Professionalism
- v. Practice based learning and improvement
- vi. Mental well-being

      c.   Complex or multiple

3. If the problem is determined to be isolated, then an appropriate action plan (clinical or non-clinical) is developed by the faculty advisor in consultation with the CCC.  Isolated problems do not necessarily require a "Success Team", as these can often be addressed in the faculty-resident advising relationship.   If there are multiple deficiencies or if the faculty advisor in consultation with the CCC determines the issue to be complex, then the faculty advisor will form a Success Team that will develop appropriate action plan in consultation with the CCC.

      a.   Structure of Success Team
- i. Chief resident
- ii. CCC Chair
- iii. Faculty Advisor
- iv. Behavioral Health representative
- v. Academic representative

      b.   Success team develops action plan using guidelines in section 4 of this document.

4. Next the program director, faculty advisor(s) and CCC chair will notify the learner in person and will provide the resident with a letter/action plan.  The resident will review the action plan, and the faculty advisor, program director or CCC chair will answer any questions to ensure understanding of the actions steps required.  The resident, faculty advisor, and CCC chair will then sign the document.  The faculty advisor will provide a copy to the resident and will place a copy in the resident's file. The letter/action plan will outline the following:

      a.   Change in academic status to "Concern Status"
      b.   The specific problematic performance with dates
      c.   The ACGME competency related to the deficiency
      d.   Goals of remediation
      e.   Measurable outcomes for success
      f.   Timeline to demonstrate improvement
      g.   Any restrictions
- i. away rotations
- ii. moonlighting
- iii. electives

      h.   If a mental health evaluation is required
      i.   The potential outcomes
- i. return to good standing
- ii. continued "Concern Status"

    iii.   Delays in training, suspension or termination if the learner fails to meet the conditions of the letter/action plan, or is an imminent risk to patients, self, or others.

5. The CCC and success team (if applicable) reassess the learner and determine if the remediation was successful or not. Details of reassessment are located in section 4 of this document.

## Appendix C: Remediation process flow diagram



## Appendix D: Remediation Strategies for Each Deficit Type (Plan Creation)

3 key elements are required for successful remediation:

1. Deliberate practice
2. Feedback
3. Self-assessment

Below is a table modified from "Remediation of the Struggling Medical Learner".  It provides deficiency specific strategies that can be matched to the learner's specific deficits.  You will notice that some of the items are not quantified or do not provide specific examples.  This is due to the fact that it is not possible to specifically create a remediation plan that will "fit" all situations or learners.  The table instead is a framework that is to be used as a tool to guide action plan development.  All action items within the action plan must be specific and measurable.

| Deficit | Remediation Strategy |
|---|---|
| Medical Knowledge | <ul><li>Identify how learner learns best</li><li>Assess level of knowledge<ul><li>Global or focal deficit?</li></ul></li><li>Review what the learner is reading and recommend resources</li><li>Emphasize learning WHY  rather than what or how</li><li>resident maintained ongoing list of items to look up</li><li>Link patient cases to reading</li><li>Give feedback</li><li>Demonstrate techniques of self-evaluation of knowledge deficits</li><li>Identify opportunities for resident to teach</li><li>Schedule reassessments of learning.</li></ul> |
| Clinical Skills | <ul><li>Identify skills gap</li><li>Assign readings, videos, or other resources on physical exam or skills/procedures</li><li>Videotape student and provide feedback</li><li>Review videotape with learner and assess self-awareness</li><li>Give more frequent feedback</li><li>Repetition and practice of clinical skills</li><li>Establish how he/she will be reassessed</li></ul> |
| Clinical Reasoning and Judgment | <ul><li>Review new and old cases with learner</li><li>Create differential diagnosis<ul><li>include most likely</li><li>include what you don't want to miss</li></ul></li></ul> |

| | |
|---|---|
| | <ul><li>Provide a framework for clinical reasoning</li><li>Identify relevant HPI questions, PE elements, and ROS questions</li><li>Have you seen or read about before?</li><li>Review diagnostic options<ul><li>do nothing</li><li>order a lab or test</li><li>prescribe a medication</li></ul></li><li>Review treatment options</li><li>Resident maintained ongoing list of clinical questions to look up and apply to patient care</li><li>Teach learner to use resources and feedback</li><li>Chart stimulated recall with feedback</li><li>Have learner specify and compare the consequences of choices</li><li>Establish how he/she will be reassessed</li></ul> |
| Time Management and Organization | <ul><li>Obtain learner's perspective and concerns</li><li>Teach data organization system</li><li>Model pre-rounding, have learner use same model with every patient</li><li>Identify tasks to be completed</li><li>Prioritize tasks</li><li>Identify length of time for each task</li><li>Have Learner keep a minute by minute log of daily activities</li><li>Give feedback</li><li>Have learner observe peers' and others' strategies and discuss</li><li>Establish how he/she will be reassessed</li></ul> |
| Interpersonal Skills | <ul><li>Review relevance of good interpersonal skills</li><li>deficiencies or conflicts should be addressed directly and privately</li><li>Give specific examples of interpersonal conflict(s)</li><li>Have learner provide or model alternative examples of positive interaction in conflict</li><li>Resident maintained self-reflection diary</li><li>View videotape to observe personal interactions and increase self-awareness</li></ul> |

55

| | |
|---|---|
| | <ul><li>Consider mental health evaluation</li><li>Present consequences of failure to improve (Official warning, probation and/or send to NM Medical Board)</li><li>Use faculty or 360 evaluations as indicated to measure progress.</li><li>Establish how he/she will be reassessed</li></ul> |
| Communication | <ul><li>Review importance of good communication</li><li>Have learner identify how communication throughout the workday can either facilitate or hinder patient care</li><li>Assign learning resources<ul><li>texts</li><li>articles</li></ul></li><li>Practice oral presentations emphasizing strong clinical reasoning</li><li>Practice summarizing complex cases</li><li>Practice specific skill sets e.g., giving bad news, interview about a sensitive topic, ask questions, etc…</li><li>View videotaped performance to enhance self-awareness.</li><li>Role modeling-observe preceptor</li><li>Teach learner to clarify communication throughout his/her day</li><li>Establish how he/she will be reassessed</li></ul> |
| Professionalism | <ul><li>Learner should meet with remediation team</li><li>Review the relevance of being professional from your perspective and her/his (remind her/him of the consequences of being perceived as unprofessional!)</li><li>Set expectations</li><li>Review specific examples of her/his unprofessional behavior</li><li>Emphasize high level of accountability</li><li>Promote self-reflection</li><li>Present consequences of failure to improve (Official warning, probation and/or send to NM Medical Board)</li><li>Limit setting</li><li>Establish how s/he will be reassessed</li></ul> |

| Practice-Based learning and Improvement | <ul><li>Ask the learner to identify her/his strengths and weaknesses which are identified in practice</li><li>Ask the learner to explore and write about the benefits of continued learning</li><li>Clarify the expectations for BPLI</li><li>Ask the learner to write a self-reflection piece that includes the purposes of feedback and independent learning and a reflection on the feedback s/he has received</li><li>Review how the resident responds to feedback and how her/his responses are perceived</li><li>Discuss implementation of new knowledge from scientific studies and/or different strategies based on feedback</li><li>Have learner complete quality improvement projects that will shed light on her/his practice</li><li>Model appropriate responses to feedback and how to incorporate self-directed learning</li><li>Establish how s/he will be reassessed</li></ul> |
| --- | --- |
| Systems-Based Practice | <ul><li>Ask the learner to explore the benefits of interprofessional input and team collaboration</li><li>Help the learner improve patient care by seeking health care resources, understanding how the healthcare system impacts care and the value of transitions of care</li><li>Teach the learner to advocate for his patients</li><li>Set expectations with a timeframe for meeting expectations</li><li>Establish how s/he will be reassessed</li></ul> |
| Mental Well-Being | <ul><li>Discuss concerns about the resident's wellbeing with student and her/his reflections</li><li>Refer for psychiatric evaluation for learning disabilities, psychiatric diagnosis, and substance abuse (www.fsphp.org), or assess for fitness for duty, evaluation and treatment</li></ul> |

|  | ● Provide supportive environment and schedule |
| | ● Teams and activities that promote camaraderie |
| | ● Stress reduction |
| | ● Skills to overcome deficits |
| | ● Feedback |
| | ● Establish how s/he will be reassessed |

## Appendix E: Sample Action Plan

Date:

Dear Dr...  (Use SBAR to provide a brief summary of need for action plan)

**Academic Status:**

**The specific problematic performance with dates:**

**The ACGME (plus) competency related to the deficiency:**

**Goals of remediation:**

**Measurable outcomes for success:**

3 key elements are required for successful remediation:

1. Deliberate practice
   a. These will be the specific action steps outlined using the strategies in section 4 of the remediation policy.
2. Feedback
   a. Regularly scheduled feedback and review sessions must be outlined here.
3. Reassessment /Self-assessment
   a. This will be a discussion of the specific steps that will be used to reassess the learner and must include an ongoing self-assessment process.

**Timeline to demonstrate improvement:**

**Restrictions:**

1. Away rotations: (if any)
2. Moonlighting: (if any)
3. Electives: (if any)

**If a mental health evaluation is required:**

**The potential outcomes:**

1. Return to good standing

2. Continued "Concern Status"
3. Delays in training, suspension or termination of the learner fails to meet the conditions of the letter/action plan, or is an imminent risk to patients, self, or others.

**Summary:**

(Use SBAR to provide a briefly summarize the above)

      **Structure of Success Team:**

1. Chief Resident
      a.
2. CCC Chair
      a.
3. Faculty Advisor
      a.
4. Behavioral Health
      a.
5. Academic Representative
      a.


Signed: _____      Date: _____

CCC Chair




Signed: _____      Date: _____

Faculty Advisor




Signed: _____      Date: _____

Resident

# EXHIBIT 3

# ACGME Program Requirements for Graduate Medical Education in Family Medicine

---

**Revision Information**
ACGME-approved major revision, effective July 1, 2023

---

**Definitions**
For more information, see the ACGME Glossary of Terms.

> Core Requirements: Statements that define structure, resource, or process elements essential to every graduate medical educational program.

> Detail Requirements: Statements that describe a specific structure, resource, or process, for achieving compliance with a Core Requirement. Programs and sponsoring institutions in substantial compliance with the Outcome Requirements may utilize alternative or innovative approaches to meet Core Requirements.

> Outcome Requirements: Statements that specify expected measurable or observable attributes (knowledge, abilities, skills, or attitudes) of residents or fellows at key stages of their graduate medical education.

**Osteopathic Recognition**
For programs with or applying for Osteopathic Recognition, the Osteopathic Recognition Requirements also apply (www.acgme.org/OsteopathicRecognition).

**Contents**

Introduction ..................................................................................................................3
Int.A.    Definition of Graduate Medical Education...................................................3
Int.B.    Definition of Specialty .................................................................................3
Int.C.    Length of Educational Program ...................................................................4
I.    Oversight ..............................................................................................................4
I.A.      Sponsoring Institution .................................................................................5
I.B.      Participating Sites .......................................................................................5
I.C.      Workforce Recruitment and Retention .........................................................6
I.D.      Resources ..................................................................................................6
I.E.      Other Learners and Health Care Personnel .................................................9
II.    Personnel ...........................................................................................................10
II.A.     Program Director .......................................................................................10
II.B.     Faculty .....................................................................................................15
II.C.     Program Coordinator.................................................................................19
II.D.     Other Program Personnel ..........................................................................21
III.    Resident Appointments .....................................................................................21
III.A.    Eligibility Requirements .............................................................................21
III.B.    Resident Complement ...............................................................................22
III.C.    Resident Transfers ....................................................................................22
IV.    Educational Program.........................................................................................23
IV.A.    Educational Components............................................................................23
IV.B.    ACGME Competencies ..............................................................................24
IV.C.    Curriculum Organization and Resident Experiences ...................................32
IV.D.    Scholarship ..............................................................................................39
V.    Evaluation...........................................................................................................41
V.A.     Resident Evaluation...................................................................................41
V.B.     Faculty Evaluation .....................................................................................45
V.C.     Program Evaluation and Improvement ........................................................46
VI.    The Learning and Working Environment ............................................................49
VI.A.    Patient Safety, Quality Improvement, Supervision, and Accountability...........50
VI.B.    Professionalism ........................................................................................53
VI.C.    Well-Being ................................................................................................55
VI.D.    Fatigue Mitigation .....................................................................................57
VI.E.    Clinical Responsibilities, Teamwork, and Transitions of Care........................58
VI.F.    Clinical Experience and Education ..............................................................59

> reviewed print/electronic resources, articles or publications, book chapters, textbooks, webinars, service on professional committees, or serving as a journal reviewer, journal editorial board member, or editor; (Outcome)

**IV.D.2.b).(2)**          **peer-reviewed publication.** (Outcome)

**IV.D.3.**        **Resident Scholarly Activity**

**IV.D.3.a)**          **Residents must participate in scholarship.** (Core)

IV.D.3.b)          Residents should complete two scholarly activities, at least one of which should be a quality improvement project. (Detail)

IV.D.3.c)          Residents should work in teams to complete scholarship, partnering with interdisciplinary colleagues, faculty members, and peers. (Detail)

IV.D.3.d)          Residents should disseminate scholarly activity through presentation or publication in local, regional, or national venues. (Detail)

## V.     Evaluation

**V.A.**        **Resident Evaluation**

**V.A.1.**         **Feedback and Evaluation**

---

**Background and Intent:** Feedback is ongoing information provided regarding aspects of one's performance, knowledge, or understanding. The faculty empower residents to provide much of that feedback themselves in a spirit of continuous learning and self-reflection. Feedback from faculty members in the context of routine clinical care should be frequent, and need not always be formally documented.

Formative and summative evaluation have distinct definitions. Formative evaluation is *monitoring resident learning* and providing ongoing feedback that can be used by residents to improve their learning in the context of provision of patient care or other educational opportunities. More specifically, formative evaluations help:
- residents identify their strengths and weaknesses and target areas that need work
- program directors and faculty members recognize where residents are struggling and address problems immediately

Summative evaluation is *evaluating a resident's learning* by comparing the residents against the goals and objectives of the rotation and program, respectively. Summative evaluation is utilized to make decisions about promotion to the next level of training, or program completion.

---

> **End-of-rotation and end-of-year evaluations have both summative and formative components. Information from a summative evaluation can be used formatively when residents or faculty members use it to guide their efforts and activities in subsequent rotations and to successfully complete the residency program.**
>
> **Feedback, formative evaluation, and summative evaluation compare intentions with accomplishments, enabling the transformation of a neophyte physician to one with growing expertise.**

**V.A.1.a)**    **Faculty members must directly observe, evaluate, and frequently provide feedback on resident performance during each rotation or similar educational assignment.** (Core)

> **Background and Intent: Faculty members should provide feedback frequently throughout the course of each rotation. Residents require feedback from faculty members to reinforce well-performed duties and tasks, as well as to correct deficiencies. This feedback will allow for the development of the learner as they strive to achieve the Milestones. More frequent feedback is strongly encouraged for residents who have deficiencies that may result in a poor final rotation evaluation.**

> Specialty-Specific Background and Intent: Educational assignments in family medicine programs includes both block and longitudinal formats. It is critical that feedback incorporates longitudinal experiences, including regular formal written feedback regarding development of competence in the FMP. Frequent feedback will provide opportunities for growth and individualized adjustments to the learning aims toward achievement of the Family Medicine Milestones.

**V.A.1.b)**    **Evaluation must be documented at the completion of the assignment.** (Core)

**V.A.1.b).(1)**    **For block rotations of greater than three months in duration, evaluation must be documented at least every three months.** (Core)

**V.A.1.b).(2)**    **Longitudinal experiences, such as continuity clinic in the context of other clinical responsibilities, must be evaluated at least every three months and at completion.** (Core)

V.A.1.b).(3)    Evaluation of the FMP continuity experience should include assessment of quality measures, EHR management, and care coordination. (Detail)

**V.A.1.c)**    **The program must provide an objective performance evaluation based on the Competencies and the specialty-specific Milestones, and must:** (Core)

**V.A.1.c).(1)**    **use multiple evaluators (e.g., faculty members, peers, patients, self, and other professional staff members); and,** (Core)

**V.A.1.c).(2)**        **provide that information to the Clinical Competency Committee for its synthesis of progressive resident performance and improvement toward unsupervised practice.** (Core)

**V.A.1.d)**        **The program director or their designee, with input from the Clinical Competency Committee, must:**

**V.A.1.d).(1)**        **meet with and review with each resident their documented semi-annual evaluation of performance, including progress along the specialty-specific Milestones;** (Core)

**V.A.1.d).(2)**        **assist residents in developing individualized learning plans to capitalize on their strengths and identify areas for growth;** (Core)

**V.A.1.d).(3)**        **develop plans for residents failing to progress, following institutional policies and procedures;** (Core)

V.A.1.d).(4)        administer an in-training examination annually; (Core)

V.A.1.d).(5)        create and document an individualized learning plan at least annually; and, (Core)

V.A.1.d).(6)        provide a system to assist residents in the individualized learning plan process, including: (Core)

V.A.1.d).(6).(a)        faculty mentorship to help residents create learning goals, as well as educational experiences to meet those goals; and, (Core)

V.A.1.d).(6).(b)        systems for tracking and monitoring progress toward completing the individualized learning plan. (Core)

---

**Background and Intent:** Learning is an active process that requires effort from the teacher and the learner. Faculty members evaluate a resident's performance at least at the end of each rotation. The program director or their designee will review those evaluations, including their progress on the Milestones, at a minimum of every six months. Residents should be encouraged to reflect upon the evaluation, using the information to reinforce well-performed tasks or knowledge or to modify deficiencies in knowledge or practice. Working together with the faculty members, residents should develop an individualized learning plan.

Residents who are experiencing difficulties with achieving progress along the Milestones may require intervention to address specific deficiencies. Such intervention, documented in an individual remediation plan developed by the program director or a faculty mentor and the resident, will take a variety of forms based on the specific learning needs of the resident. However, the ACGME recognizes that there

---

> are situations which require more significant intervention that may alter the time course of resident progression. To ensure due process, it is essential that the program director follow institutional policies and procedures.

Specialty-Specific Background and Intent: Master adaptive learners are prepared, during the educational program, for future learning. They are taught to assess their fund of knowledge for needs to be updated and to adapt to incorporate new knowledge. These skills are best learned in the formative stages of graduate medical education so they can be carried throughout one's career. Master adaptive learners are provided time for self-reflection, readily identify gaps in knowledge, have timely access to resources used to address gaps, and are able to iterate their knowledge base accordingly.

**V.A.1.e)**    **At least annually, there must be a summative evaluation of each resident that includes their readiness to progress to the next year of the program, if applicable.** (Core)

**V.A.1.f)**    **The evaluations of a resident's performance must be accessible for review by the resident.** (Core)

**V.A.2.**    **Final Evaluation**

**V.A.2.a)**    **The program director must provide a final evaluation for each resident upon completion of the program.** (Core)

**V.A.2.a).(1)**    **The specialty-specific Milestones, and when applicable the specialty-specific Case Logs, must be used as tools to ensure residents are able to engage in autonomous practice upon completion of the program.** (Core)

**V.A.2.a).(2)**    **The final evaluation must:**

**V.A.2.a).(2).(a)**    **become part of the resident's permanent record maintained by the institution, and must be accessible for review by the resident in accordance with institutional policy;** (Core)

**V.A.2.a).(2).(b)**    **verify that the resident has demonstrated the knowledge, skills, and behaviors necessary to enter autonomous practice; and,** (Core)

**V.A.2.a).(2).(c)**    **be shared with the resident upon completion of the program.** (Core)

**V.A.3.**    **A Clinical Competency Committee must be appointed by the program director.** (Core)

**V.A.3.a)**    **At a minimum, the Clinical Competency Committee must include three members of the program faculty, at least one of whom is a core faculty member.** (Core)

**V.A.3.a).(1)**   Additional members must be faculty members from the same program or other programs, or other health professionals who have extensive contact and experience with the program's residents. (Core)

---

**Background and Intent:** The requirements regarding the Clinical Competency Committee do not preclude or limit a program director's participation on the Clinical Competency Committee. The intent is to leave flexibility for each program to decide the best structure for its own circumstances, but a program should consider: its program director's other roles as resident advocate, advisor, and confidante; the impact of the program director's presence on the other Clinical Competency Committee members' discussions and decisions; the size of the program faculty; and other program-relevant factors. Inclusivity is an important consideration in the appointment of Clinical Competency Committee members, allowing for diverse participation to ensure fair evaluation. The program director has final responsibility for resident evaluation and promotion decisions.

The program faculty may include more than the physician faculty members, such as other physicians and non-physicians who teach and evaluate the program's residents. There may be additional members of the Clinical Competency Committee. Chief residents who have completed core residency programs in their specialty may be members of the Clinical Competency Committee.

---

**V.A.3.b)**   The Clinical Competency Committee must:

**V.A.3.b).(1)**   review all resident evaluations at least semi-annually; (Core)

**V.A.3.b).(2)**   determine each resident's progress on achievement of the specialty-specific Milestones; and, (Core)

**V.A.3.b).(3)**   meet prior to the residents' semi-annual evaluations and advise the program director regarding each resident's progress. (Core)

**V.B.**   **Faculty Evaluation**

**V.B.1.**   The program must have a process to evaluate each faculty member's performance as it relates to the educational program at least annually. (Core)

---

**Background and Intent:** The program director is responsible for the educational program and all educators. While the term "faculty" may be applied to physicians within a given institution for other reasons, it is applied to residency program faculty members only through approval by a program director. The development of the faculty improves the education, clinical, and research aspects of a program. Faculty members have a strong commitment to the resident and desire to provide optimal education and work opportunities. Faculty members must be provided feedback on their contribution to the mission of the program. All faculty members who interact with residents desire feedback on their education, clinical care, and research. If a faculty member does not interact with residents, feedback is not required. With regard to the diverse operating

---

**EXHIBIT 4**

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**El Paso Area Office**
100 N. Stanton Street, Suite 600
El Paso, TX  79901
(800) 669-4000
Website:  www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 02/02/2024

**To:** Dr. Martyn Urquijo
2457 El Dorado CT
Las Cruces, NM 88011

Charge No: 453-2024-00261

EEOC Representative and email:   Susana Nahas
EEO Federal Investigator
susana.nahas@eeoc.gov

---

### DISMISSAL OF CHARGE

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 453-2024-00261.

On behalf of the Commission,

Digitally Signed By:Elizabeth Porras
02/02/2024

Elizabeth Porras
Area Office Director

**Cc:**

Margot Veranes
Lubin & Enoch, PC, Arizona Office
349 N 4th Ave
Phoenix, AZ 85003


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 453-2024-00261 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Travis Nicholson, 207 S. Houston Street 3rd Floor, Dallas, TX 75202.

**<u>To make a Section 83 request for your charge file</u>**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 453-2024-00261 to the District Director at Travis Nicholson, 207 S. Houston Street 3rd Floor, Dallas, TX 75202.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

FILED
3rd JUDICIAL DISTRICT COURT
Dona Ana County
5/3/2024 11:01 AM
BERNICE A. RAMOS
CLERK OF THE COURT
Melissa Wood

STATE OF NEW MEXICO
COUNTY OF DONA ANA
THIRD JUDICIAL DISTRICT COURT

MARTYN URQUIJO,

                    Plaintiff,

V.                                                    Case No.     D-307-CV-2024-01035

                                                      Judge:
PHC-LAS CRUCES, INC. D/B/A MMC
FAMILY PRACTICE,                                      **James T. Martin**

                    Defendant.

## ORDER REQUIRING SCHEDULING REPORTS, A DISCOVERY PLAN, EXPERT WITNESS DISCLOSURE, AND LIMITING STIPULATIONS TO ENLARGE TIME FOR RESPONSIVE PLEADINGS

IT IS SO ORDERED:

A.    Plaintiff shall serve a copy of this order on each defendant with the summons and complaint and file a certificate of such service. Parties other than plaintiffs who assert claims against others who have not been served with this order shall serve a copy of this order on those against whom they assert claims with the pleading asserting such claims and shall file a certificate of such service.

B.    Within sixty (60) calendar days after the initial pleading is filed, parties of record shall file a scheduling report with copies to opposing parties and the assigned judge. Parties shall confer and are encouraged to file a Joint Scheduling Report, LR3-Form 2.12 NMRA for Track A or LR3-Form 2.13 for Tracks B and C, or, if they cannot agree, file an individual Scheduling Report, LR3-Form 2.13 NMRA. *See* copies of forms attached hereto.

C.    Any party who enters an appearance in the case more than sixty (60) calendar days after the filing of the initial pleading shall file a scheduling report within ten (10) business days and deliver a copy to the assigned judge.

D.      If all parties are not of record within sixty (60) calendar days of the filing of the initial pleading, the party making claims against the absent parties *(Plaintiff for Defendants, Third-Party Plaintiffs for Third-Party Defendants, etc.)* shall, within five (5) business days after the sixtieth (60th) day, file and serve parties of record and deliver to the assigned judge, a written explanation why the case is not at issue and how much time is needed before the case will be at issue. The notice shall be titled "Delay in Putting the Matter at Issue."

E.      Counsel or parties who do not have attorneys may not stipulate to an enlargement of time greater than fourteen (14) calendar days for the filing of a responsive pleading without a motion and order. The motion shall state with particularity the reason(s) an enlargement is in the best interests of the parties. A copy of the motion and stipulation shall be delivered to all parties as well as counsel. The enlargement requested shall be for a specified time.

F.      When all parties have been joined and the case is at issue, the parties shall immediately notify in writing the assigned judge and the alternative dispute resolution coordinator.

G.      If appropriate, the court will refer this matter to settlement facilitation under Part VI of the Local Rules of the Third Judicial District Court.

H.      Within seventy-five (75) calendar days from the date the initial pleading is filed, or fifteen (15) calendar days after the parties alert the Court that the case is at issue, the parties shall either:

    (1)      stipulate to a discovery plan and file the stipulation with the court, or

    (2)      request a hearing to establish a discovery plan pursuant to Paragraph F of Rule 1-026 NMRA.

    (3)      In the absence of a stipulated discovery plan or a timely request from a party for a hearing to establish a discovery plan, the following plan shall go into effect:
    Within one hundred (100) calendar days after the initial pleading was filed or fifteen (15) calendar days after a party has entered the suit, whichever is the later date, each party shall provide to all other parties:

        a.      The name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed issues raised by the pleadings, identifying the subjects of the information;

b.       A copy of, or a description by category and location of, all documents, data compilations, and tangible things in the possession, custody, or control of the party that are relevant to disputed issues raised by the pleadings;

c.       A computation of any category of damages claimed by the disclosing party, providing copies or making available for inspection and copying the documents or other evidentiary materials and medical records and opinions, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered;

d.       For inspection and copying, any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment;

e.       If the medical condition of a party is at issue, such party shall give a medical release authorization to opposing parties. The parties shall confer regarding the nature and extent of the release and stipulate, if possible. If the parties cannot agree, each party shall file a memorandum with a proposed medical release authorization advocating that party's proposed form to the court. A copy of the memorandum and proposed form shall be delivered to the assigned judge. Rule 1-007.1 NIMRA shall apply.

I.       Pursuant to Rule l-026(E) NMRA, parties shall reasonably supplement discovery required in Subparagraphs (3)(a) through (e) of Paragraph H of this Order.

J.       Intent to Call Expert Witness - Disclosure. All parties shall exchange a "Notice of Intent to Call Expert Witness(es)" listing the names, addresses and phone numbers for all anticipated experts, including a brief summary of the subject matter of each witness' testimony. If an expert has not yet been identified by a party, the parties must list the specialized area(s) in which an expert is anticipated to be retained and a brief summary of the areas or issues on which the expert is expected to testify.

With respect to each expert listed, all parties are to observe their continuing duty to timely supplement discovery and shall further abide by the requirements of Section 8 of the attachment to the Rule 16(B) Scheduling Order.

_____
DISTRICT COURT JUDGE

Delivered to Plaintiff on May 3, 2024

Bernice A. Ramos
Clerk of the District Court



/s/ Melissa Wood
_____
Judicial Specialist

LR3-Form 2.12

Supreme Court Approved
August 6, 2004

STATE OF NEW MEXICO
COUNTY OF DONA ANA
THIRDJUDICIAL DISTRICT COURT

Plaintiff

vs.

NO.: D-307-CV
Judge:

Defendant

JOINT SCHEDULING REPORT STIPULATING TO TRACK A

Come now all the parties to this case, (by their counsel of record) and stipulate as

follows:

1   The court has subject matter and personal jurisdiction, and venue is proper.

2   This case is appropriate for assignment to Track A

3   The parties do not intend to amend the pleadings or file dispositive motions

*4*   All parties will be ready for trial *by_____(no more than six (6) months from*

    *filing of complaint)*

5   Witness lists will be exchanged and filed forty-five (45) days before trial

6   Discovery limited to interrogatories, requests for production and admission and no more

    than two (2) depositions per party.

7   All parties and counsel will either (a) select a facilitator by agreement of the parties, or

    (b) request the court's ADR coordinator to select a facilitator and will engage in a

    settlement conference within ninety (90) days from the date of the filing of the complaint.

    The parties may move for enlargement of time for the settlement conference for good

    cause shown the parties shall share the facilitator's fee, if any, equally.

8. Exhibits: exchanged at least fifteen (15) days before trial.

This Jury_____   6 ___      12 non-jury ___    ) matter will take_____hours to try.

9. Conflicting court hearings (or other conflicts which show good cause for not setting trial)

for two (2) months following the date the matter is ready for trial:

_____

_____

10. Other: _____

SUBMITTED BY:

Name of party:          _____
Attorney:               _____
Address:                _____
                        _____
Telephone Number        _____


Name of party:          _____
Attorney:               _____
Address:                _____
                        _____
Telephone Number        _____

### CERTIFICATE OF MAILING

I HEREBY CERTIFY that I mailed, delivered or faxed a copy to the assigned judge and each party or each party's attorney on the _____ day of _____, 20 _____.

_____
Signature

LR3-Form 2.13. (_____'s) (Joint) scheduling report.

STATE OF NEW MEXICO
COUNTY OF DOÑA ANA
THIRD JUDICIAL DISTRICT COURT

_____, Plaintiff


vs.

                                             NO.:  D-307-CV-
                                             Judge:
_____, Defendant

(_____'S) (JOINT) SCHEDULING REPORT

1. This case should be assigned to Track _____.
2. Jurisdiction and Venue: _____Stipulated;  _____ Disputed;
       Why: _____.
3. _____Non Jury;  _____ 6-person jury;  _____12-person jury.
4. Significant legal issues, if any:  _____
   _____.
5. Trial witnesses presently known (defendant's, plaintiff's, etc.):  _____
   State expert type:  _____.
6. Settlement:
   _____ [I] [We] have sufficient information to evaluate the case.
   _____ [I] [We] have provided sufficient information for opposing parties to evaluate the
   case.
   _____ [I] [We] need the following information from _____ to evaluate the case:
   _____.
   _____ [I] [We] need the following discovery to obtain information sufficient to evaluate
   the case:
   _____.  Explain why such information cannot be
   obtained informally without formal discovery:
   _____.
   _____ [I] [We] have scheduled a settlement conference on _____, 20_____ with
   _____ *(facilitator)* or have requested the court's ADR coordinator to refer
   to facilitation.
   **Or**
   _____ [I] [We] request that this not be referred to facilitation because:
   _____.
   The possibility of settlement is _____ good,  _____ fair,  _____ poor.

7. Discovery:

[I] [We] estimate it will take _____ months to complete discovery. *(Attach discovery plan if stipulated, or request for setting a discovery conference if wanted.)* If any party requests a discovery conference, answer the following:

The party submitting this scheduling report intends to do the following discovery:

_____.

*(If this is a joint scheduling report, each party shall answer this question.)*

[Plaintiff] [Defendant] intends to do the following discovery:

_____

_____.

8. [I] [We] estimate that trial will take _____ court days to try.

9. Dates counsel will not be available for trial due to the following conflicting court settings (*beginning with the date immediately following the time you estimate discovery will be completed):* _____

10. Stipulations: _____.

11. Other:

_____.

SUBMITTED BY:

Name of party:       _____

Attorney:            _____

Address:             _____

                     _____

Telephone Number     _____


Name of party:       _____

Attorney:            _____

Address:             _____

                     _____

Telephone Number     _____


CERTIFICATE OF MAILING

I HEREBY CERTIFY that I mailed, delivered or faxed a copy to the assigned judge and each party or each party's attorney on the _____ day of _____, 20 _____.


                     _____
                     Signature

FILED
3rd JUDICIAL DISTRICT COURT
Dona Ana County
6/3/2024 3:59 PM
BERNICE A. RAMOS
CLERK OF THE COURT
Claudine Bernal

STATE OF NEW MEXICO
COUNTY OF DOÑA ANA
IN THE THIRD JUDICIAL DISTRICT

MARTYN URQUIJO,                                    No. D-207-CV-2024-01035

       Plaintiff,

v.                                                 (Honorable Judge James T. Martin)

PHC-LAS CRUCES, INC. D/B/A/ MMC
FAMILY PRACTICE.

       Defendants.

## PROOF OF SERVICE

The undersigned certifies that on May 31, 2024, service of process (summons and a copy of the complaint was made on Defendant PHC Las Cruces, Inc., D/B/A MMC Family Practice, through Michael W. Peters, counsel for PHC Las Cruces, Inc., D/B/A MMC Family Practice, an agent authorized to receive service on behalf of Defendant PHC Las Cruces, Inc., D/B/A MMC Family Practice. *See* attached letter acknowledging and accepting service of process. I declare under penalty of perjury that the foregoing is true and correct.

*Sheri L. Estrada*

Sheri L. Estrada

1

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of June 2024, I electronically filed and transmitted the attached **AFFIDAVIT OF SERVICE** by using the New Mexico File & Serve E-filing Online System.

/s/ Sheri L. Estrada

FILED
3rd JUDICIAL DISTRICT COURT
Dona Ana County
6/6/2024 11:24 AM
BERNICE A. RAMOS
CLERK OF THE COURT
Melissa Wood

STATE OF NEW MEXICO
COUNTY OF DOÑA ANA
IN THE THIRD JUDICIAL DISTRICT

MARTYN URQUIJO,                             No. D-307-CV-2024-01035

          Plaintiff,                        (Hon. James T. Martin)

v.

PHC-LAS CRUCES, INC. D/B/A/ MMC
FAMILY PRACTICE.

          Defendants.

_____

## PLAINTIFF'S JURY DEMAND

Pursuant to New Mexico Rule of Civil Procedure District Court ("NMRCP") 1 -038(A) and (B), Plaintiff Martyn Urquijo ("Dr. Urquijo" or "Plaintiff"), by and through his attorneys at Lubin & Enoch P.C., hereby submits this demand for a trial by jury of six persons of any issue triable of right.

RESPECTFULLY SUBMITTED this 3rd day of June 2024.

                              */s/ Margot Veranes*
                              Margot Veranes
                              LUBIN & ENOCH, P.C.
                              Clara S. Acosta, State Bar No. 154496
                              Morgan L. Bigelow, State Bar No. 161862
                              Margot Veranes, State Bar No. 160248
                              150 Washington Avenue, Ste. 201
                              Santa Fe, New Mexico 87501
                              Telephone: (505) 407-0400
                              Facsimile: (602) 626-3586
                              Email: clara@lubinandenoch.com
                                   morgan@lubinandenoch.com
                                   margot@lubinandenoch.com
                              *Attorneys for Plaintiff*

1

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 3rd day of June 2024, I electronically filed and transmitted the attached **JURY DEMAND** by using the New Mexico File & Serve E-filing Online System.

*/s/ Sheri L. Estrada*